IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : CRIMINAL NO. 1:21-CR-59 |
| | : |
| v. | : (Judge Conner) |
| | : |
| **KEVIN SHAKOY PERRY,** | : |
| | : |
| **Defendant** | : |

# MEMORANDUM

Defendant Kevin Shakoy Perry moves to suppress the gun and other physical evidence police found during the search of a vehicle he had been driving. We will deny Perry's motion.

## I.   Factual Background[1]

Police Officer Justin Taylor was a three-year veteran of the Harrisburg Bureau of Police—and had been a member of its street crimes unit for just three months—when he started his shift at 2:00 p.m. on October 16, 2020, with a rollcall briefing from his supervisor, Sergeant Tyron Meik. (See 12/13/22 Tr. 4:19-5:8, 5:24-6:7, 19:5-8). The briefing concerned "a neighborhood complaint of suspected illegal activity in the [city's] uptown area, specifically Alricks Street." (See id. at 6:14-16). The complainant did not name a particular perpetrator, but they mentioned seeing

---

[1] The following factual narrative derives from testimonial evidence adduced at the suppression hearing held on December 13, 2022. Citations to the suppression hearing transcript are abbreviated as "12/13/22 Tr. __." Hearing exhibits are cited as "Gov't Ex. __" and "Def. Ex. __." This recitation of facts reflects the court's credibility determinations. The court finds each of the witnesses credible as a general matter, and we resolve pertinent conflicts in their testimony as explained *infra*.

a green vehicle in the vicinity and submitted "video of a vehicle that appeared to be a late-model green sedan." (See id. at 8:3-10, 16:20-17:1). Officer Taylor drove to the intersection of Alricks and Hoffman Streets in an unmarked police SUV. (See id. at 5:14-23, 16:14-15, 22:9-23:1; see also Def. Ex. 1). Dauphin County Adult Probation Officers ("APO") Daniel Kinsinger and Anne-Marie Christian accompanied him. (See 12/13/22 Tr. 5:18-23, 6:18-24, 47:7-16; see also Gov't Ex. 2 at 1).

A brief description of the neighborhood, drawn in part from the Google Maps satellite image entered into evidence at the suppression hearing, (see Def. Ex. 3), will help set the scene. Alricks Street is a narrow, unlined, two-way road running east to west; it is bisected by Hoffman Street. (See 12/13/22 Tr. 16:12-14). The area surrounding the intersection is mainly residential and offers unmetered street parking. (See id. at 8:17-9:4, 22:11-13, 53:24-54:7). The 500 block of Alricks Street—situs of relevant events in the matter *sub judice*—is bounded to the north and south by residential yards; there are no curbs or sidewalks. (See Def. Ex. 3).

Officer Taylor positioned his vehicle on Alricks Street facing west across the intersection to keep watch "for any vehicles making traffic infractions." (See 12/13/22 Tr. 7:6-8, 16:14-15). Shortly after 5:00 p.m., he observed a green Ford Taurus make a lefthand turn from Hoffman Street onto the 500 block of Alricks Street and park on the northern (right) side of the road. (See id. at 7:9-14, 8:11-9:4, 17:3-5, 22:9-23:1, 43:4-18, 53:8-54:21; see also Gov't Ex. 1). The weather was clear, and no other cars were on the road at the time. (See 12/13/22 Tr. 23:18-24). Although the driver had parked the Taurus in a lawful spot, Officer Taylor did not see him use his turn signal to park, leading him to believe the driver had violated

Pennsylvania's Vehicle Code.  (See id. at 7:12-14, 8:11-14); see also 75 PA. CONS. STAT. § 3334 ("Turning movements and required signals").  Officer Taylor activated his lights and siren and drove approximately 40 to 75 yards across the intersection toward the Taurus.  (See 12/13/22 Tr. 9:7-11, 16:8-16, 17:6-25, 52:9-53:7).  Defendant Perry exited the Taurus and began walking casually northbound across the grass toward the house he shared with his mother; he was alone.  (See id. at 9:12-24, 18:7-19, 44:2-16, 45:17-20, 67:25-68:7).  Officer Taylor parked in front of the Taurus, exited his vehicle, and yelled to Perry—who was about 30 to 35 yards away from the Taurus by this point—to get his attention, but he did not respond right away.  (See id. at 10:4-11:2).  Perry eventually looked back toward the officers.  (See id. at 50:12-51:22).

APO Kinsinger recognized Perry from his previous visits with the Intensive Drug Unit, the subdivision of Dauphin County Probation Services ("DCPS") that typically supervises felony drug offenders.[2]  (See id. at 27:23-28:20, 29:20-23, 44:23-45:16, 48:8-20, 50:25-51:3; see also Gov't Ex. 4).  He called out to Perry a few times by

---

[2] The parties and their witnesses used "probation" and "parole" interchangeably when referring to Perry's supervision.  (Compare 12/13/22 Tr. 34:9-19, 68:12-17 (probation), with id. at 48:15-17, 68:8-11 (parole)).  Perry's DCPS supervisor, APO Sean Hamor, testified Perry had been paroled in separate criminal cases in Dauphin and Cumberland Counties, the latter of which came under DCPS's purview "on a transfer docket."  (See id. at 78:9-79:15); see also Gov't Ex. 4.  Publicly available criminal dockets confirm Perry was serving revocation sentences for drug-related felonies and other crimes in both counties at the time of his arrest; he was granted early release from prison in Dauphin County in February 2020, and received an immediate parole sentence in Cumberland County that March.  See Dauphin County Court of Common Pleas Docket No. CP-22-CR-0004607-2017, at 2-3, 6; Cumberland County Court of Common Pleas Docket No. CP-21-CR-0002918-2017, at 3-4, 7-8.

3

name, but Perry kept walking. (See 12/13/22 Tr. 10:6-14, 45:25-46:18, 51:2-53:5). Both officers caught up with Perry and grabbed him by his arms before handcuffing him and bringing him back to the Taurus. (See id. at 11:9-10, 20:6-9, 28:21-29:6, 48:21-49:11). Officer Taylor thought Perry might pose a safety risk "[d]ue to how he separated himself from the vehicle," (see id. at 11:10-14, 24:6-14), but he did not frisk Perry, (see id. at 25:19-26:3). Sergeant Meik, APO Bruce Cutter, and several other law enforcement officers arrived a short time later to assist. (See id. at 62:14-23, 63:16-22, 69:11-14).

Perry visibly was nervous; "his emotions were extremely high and he was anxious." (See id. at 33:12-22). Officer Taylor explained the reason for the stop— "[t]he turn signal violation"—and asked Perry why he did not stop when the officers called out to him. (See id. at 11:15-18, 12:16-19). Perry said he did not hear them, though he was not wearing ear buds and there were no obvious environmental factors that might have obstructed his hearing. (See id. at 10:15-18, 12:18-22; see also id. at 19:20-24). Officer Taylor requested Perry's driver's license and proof of registration, but Perry denied the Taurus was his and claimed he locked his key inside the car. (See id. at 11:21-12:3, 29:14-19, 31:9-32:17, 55:10-16). Perry provided other information Officer Taylor used to confirm his identity. (See id. at 12:10-15). Perry's license was valid and he had "no wants or warrants." (See id. at 12:10-11, 20:14-18). Officer Taylor gave Perry a verbal warning, uncuffed him, and told him

he was free to leave; Perry began walking away. (See id. at 12:10-12, 12:23-25, 33:23-34:10).[3]

Perry, it turns out, was not free to leave. APO Kinsinger believed Perry was hiding contraband in the Taurus, so he called Perry back to the car and said he was going to conduct a probation check. (See id. at 13:3-5, 34:9-25, 41:23-42:1). Perry reiterated that he had locked his key inside the Taurus, but APO Kinsinger did not see one in plain view. (See id. at 35:2-4). Perry indicated the car belonged to his stepfather, who could provide a spare key when he got home in a few hours. (See id. at 35:1-7). APO Kinsinger grew more suspicious when Perry said he was coming from work: Perry had gotten off work at 3:00 p.m., more than two hours earlier. (See id. at 35:5-12). Perry submitted to a search of his person; he unzipped his coat and—oddly—his pants, lifted his genitals, and denied hiding anything. (See id. at 36:2-15). He also consented to a search of his bedroom. (See id. at 36:17, 37:4-7). APO Kinsinger left Perry in APO Cutter's custody so he could call their supervisor and inform him about the situation. (See id. at 57:20-25; see also Gov't Ex. 2 at 2). The supervisor advised APO Kinsinger to have a towing company come and pop the lock if necessary. (See id. at 37:8-17, 39:22-41:12).

Perry's mother, Katrina Ray, received a call about her son's situation while leaving work. (See id. at 68:25-69:8). Ray arrived a few minutes later, identified herself, and spoke with the officers; they permitted Perry to hand Ray his wallet,

---

[3] Officer Taylor did not testify to what happened next. He had returned to his police SUV, deactivated its emergency equipment, and moved the vehicle to the other side of the road. (See 12/13/22 Tr. 12:25-13:2).

cash, and house key, but not his phone. (See id. at 35:14-17, 69:9-10, 70:1-12, 71:23-72:1). APO Kinsinger explained what was happening and said he wanted to search the Taurus for contraband. (See id. at 72:13-19). Ray told him the Taurus belonged to her son, though Perry interjected that it had not yet been formally transferred into his name. (See id. at 35:18-21, 39:18-21, 72:7-12). APO Kinsinger informed Ray he would call a towing company to unlock the car. (See id. at 60:15-19). She agreed to let officers search Perry's room in the meantime and escorted APO Kinsinger and two or three other probation officers inside her house. (See id. at 37:2-3, 70:13-16, 75:17-19). The investigators canvassed the residence and searched Perry's room but did not find any contraband. (See id. at 37:7-8, 47:2-4, 75:6-77:7).

APO Cutter and Sergeant Meik remained outside with Perry during the search; Ray returned from the house a few minutes later. (See id. at 37:19-22, 60:3-12, 70:21-23). She and Perry got close to one another and started whispering back and forth. (See id. at 60:20-23, 71:6-22). Perry said he was hot and took off his jacket. (See id. at 60:23-61:1). He then handed Ray the key to the Taurus. (See id. at 61:1-3, 66:10-23, 72:20-73:1). Several probation officers surrounded Ray and said, "He handed her something." (See id. at 73:5-10, 74:14-19). Ray relinquished the key and went back inside her home. (See id. at 73:11-24, 74:20-25).[4]

---

[4] APO Cutter claimed Ray handed him the key, but Ray testified she placed the key on the hood of the Taurus; APO Cutter also said Ray told him there was a gun in the car, but Ray denied saying anything at all. (Compare 12/13/22 Tr. 61:19-21, 63:11-62:1, with id. at 73:11-75:2, 81:8-15). We have no reason to doubt either witness's recollections. Their credibility being in equipoise, we decline to factor this interaction into our reasonable suspicion analysis.

6

APO Kinsinger called APO Cutter from the residence and learned what had transpired in his absence. (See id. at 37:23-38:25). Upon leaving the residence, someone told APO Kinsinger Perry had hidden the car key between his buttocks, though he could not recall who relayed that fact. (See id. at 38:20-39:9). APO Cutter waited for APO Kinsinger to return before unlocking the Taurus and searching it with APO Christian; they found a loaded firearm and a grinder containing a small amount of marijuana in the center console. (See id. at 61:23-62:5, 64:2-21). Officer Taylor arrested Perry and Mirandized him. (See id. at 14:13-15). Perry admitted he was aware of the gun in the car, but did not say to whom it belonged. (See id. at 14:16-22).

II.  **Procedural History**

A federal grand jury indicted Perry on one count each of possession of a firearm by a prohibited person and possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(g)(1) and (k), respectively. Perry pled not guilty and moved to suppress the physical evidence seized from his vehicle. The court held a hearing on the suppression motion on December 13, 2022, at which Officer Taylor, APOs Kinsinger and Cutter, and Ray testified. The motion is fully briefed and ripe for disposition.

III.  **Discussion**

Perry challenges the constitutionality of the traffic stop and the vehicle search. We address each event *seriatim*.

### A. Traffic Stop

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. See U.S. CONST. amend. IV; Horton v. California, 496 U.S. 128, 133 (1990). When a police officer has reasonable suspicion a crime has occurred, the officer may stop a suspect on the street for further investigation. See Terry v. Ohio, 392 U.S. 1, 30 (1968). Likewise, if the officer reasonably suspects a person has committed a traffic violation, he may stop the vehicle the person was driving and question the driver. See Whren v. United States, 517 U.S. 806, 810 (1996) (citations omitted); United States v. Green, 897 F.3d 173, 178 (3d Cir. 2018) (citing Navarette v. California, 572 U.S. 393 (2014); United States v. Delfin-Colina, 464 F.3d 392, 396-97 (3d Cir. 2006)). To justify a stop in either setting, an officer must show specific, articulable facts supporting his belief the individual broke the law. See United States v. Foster, 891 F.3d 93, 104 (3d Cir. 2018) (citing Terry, 392 U.S. at 1) (discussing general criminal activity); Delfin-Colina, 464 F.3d at 398 (discussing violations of traffic laws).

The Pennsylvania Vehicle Code enumerates certain requirements for using turn signals while operating a vehicle on the Commonwealth's roadways:

> **(a) General rule.**--Upon a roadway no person shall turn a vehicle or move from one traffic lane to another or enter the traffic stream from a parked position unless and until the movement can be made with reasonable safety nor without giving an appropriate signal in the manner provided in this section.
>
> **(b) Signals on turning and starting.**--At speeds of less than 35 miles per hour, an appropriate signal of intention to turn right or left shall be given continuously during not less than the last 100 feet traveled by the vehicle before

> turning.  The signal shall be given during not less than
> the last 300 feet at speeds in excess of 35 miles per hour.
> The signal shall also be given prior to entry of the vehicle
> into the traffic stream from a parked position.
>
> . . .
>
> **(d) Discontinuing turn signals.**--Turn signals shall be
> discontinued immediately after completing the turn or
> movement from one traffic lane to another traffic lane.

75 PA. CONS. STAT. § 3334.  Drivers must use a turn signal when moving from one "traffic lane to another," when turning left or right, or when "enter[ing] the traffic stream from a parked position."  Id.  Section 3334 does not, by its plain terms, require a driver to use his turn signal to park.  The Superior Court of Pennsylvania recently confirmed this construction of the statute in Commonwealth v. Tillery, 249 A.3d 278 (Pa. Super. Ct. 2021), but that precedential decision was published five months after Officer Taylor stopped Perry, depriving the officer of its benefit.  See Tillery, 249 A.3d at 285 ("The statute does not address 'mov[ing] out of the flow of traffic,' . . . or require the use of a turn signal to pull into a parking place." (quoting Commonwealth v. Puit, No. 1060 MDA 2019, 2020 WL 211536, at *2 (Pa. Super. Ct. Jan. 14, 2020))).

Given the ambiguity surrounding the statute's reach at the time Officer Taylor stopped Perry, the present dispute turns on whether Officer Taylor reasonably believed the law required Perry to use his turn signal to park, even if that belief was mistaken.  See Heien v. North Carolina, 574 U.S. 54, 60 (2014) (holding reasonable suspicion for vehicle stop "can rest on a mistaken understanding of the scope of a legal prohibition").  The parties offer diametrically

9

opposed answers to that question. (Compare Doc. 48 at 6-8, and Doc. 70 at 4-7, with Doc. 53 at 5-7). For purposes of this analysis, Perry assumes he did not signal. (See Doc. 48 at 4-5). He relies upon a precedential superior court opinion from 2020 in which the panel acknowledged the trial court's conclusion the Vehicle Code *does not* require drivers to use a turn signal when parking, but reversed its suppression order for other reasons. (See id. at 6 (citing Commonwealth v. Richard, 238 A.3d 522, 526 (Pa. Super. Ct. 2020))). The government, in turn, cites an unpublished superior court decision from earlier that year in which the court expressly stated it was objectively reasonable to believe Section 3334 *does* require use of a turn signal in the same scenario. (See Doc. 53 at 5-6 (citing Puit, 2020 WL 211536)).

      We are constrained to agree with the government. Officer Taylor's mistaken assessment of Perry's failure to signal was the result not of "sloppy study of the laws," see Heien, 574 U.S. at 66, but rather the unsettled state of the law itself. Pennsylvania law at the time of Perry's detention was sufficiently ambiguous that state trial and appellate courts reached different conclusions about whether Section 3334 applies to drivers who fail to use a turn signal when parking. Compare Puit, 2020 WL 211536, at *2, with Richard, 238 A.3d at 527. A unanimous three-judge panel of the superior court found such an application "objectively reasonable" nine months before Perry's arrest. See Puit, 2020 WL 211536, at *2. The superior court did not reject Puit and resolve the statutory question definitively in a precedential opinion until March 2021, several weeks after Perry was indicted. See Tillery, 249 A.3d at 284-85. Perry's reliance upon Richard—the only other relevant appellate decision preceding his arrest—is unavailing because the superior court

resolved that case on alternative grounds and did not adopt the trial court's analysis of Section 3334. See Richard, 238 A.3d at 527.

Courts in this circuit recently have confronted the issue of how to treat evidence seized following an erroneous traffic stop under Section 3334. In United States v. McBroom, No. 21-97, 2021 WL 5240230 (W.D. Pa. Nov. 8, 2021), the court initially suppressed evidence obtained under similar circumstances to those presented here, before reconsidering and vacating its order. See McBroom, 2021 WL 5240230, at *5-6 (citing Heien, 574 U.S. at 66). The officers in McBroom mistakenly stopped the motorist for failing to signal while parking, yet the court found their error reasonable given the statute's "undefined terminology," which "inject[ed] fair questions of interpretation" like those raised in Puit. See id. at *4-5 (citing Puit, 2020 WL 211536, at *2). At least four Pennsylvania jurists—one federal and three Commonwealth—have sanctioned pre-Tillery car stops for failing to signal as objectively reasonable, and we are hard-pressed to reach a contrary conclusion. Given the reasonableness of Officer Taylor's (mistaken) assessment, we find no Fourth Amendment violation.

  **B. Vehicle Search**

Perry contends APO Kinsinger and his fellow probation officers unlawfully searched the Taurus. (See Doc. 48 at 8-9; Doc. 70 at 7-8). We disagree. Law enforcement officers ordinarily must demonstrate probable cause that contraband or evidence of a crime likely will be found inside a vehicle to search it without a warrant. See California v. Carney, 471 U.S. 386, 390, 392 (1985); United States v. Burton, 288 F.3d 91, 100 (3d Cir. 2002) (citing Pennsylvania v. Labron, 518 U.S.

11

938, 940 (1996) (*per curiam*)). The quantum of cause necessary to justify a warrantless search of probationers and parolees and their property, however, is mere reasonable suspicion of wrongdoing. See United States v. Baker, 221 F.3d 438, 443-44 (3d Cir. 2000) (citing Griffin v. Wisconsin, 438 U.S. 868, 880 (1987) (probationers); United States v. Hill, 967 F.2d 902, 909 (3d Cir. 1992) (parolees)). Relevant considerations include a suspect's appearance and demeanor, see United States v. Brown, 448 F.3d 239, 251 (3d Cir. 2006) (collecting cases), along with "puzzling responses," inconsistencies, and demonstrable falsehoods given in response to basic inquiries by law enforcement, see United States v. Green, 897 F.3d 173, 186 (3d Cir. 2018); United States v. Benoit, 730 F.3d 280, 285-86 (3d Cir. 2013).

Several additional factors unique to the parole and probation context come into play here. Our court of appeals has noted, for instance, that a reasonably prudent probation or parole officer may rely upon "information relayed by others, even if not law enforcement, even if anonymous, and even if not intrinsically reliable." See United States v. Henley, 941 F.3d 646, 654 (3d Cir. 2019) (regarding "general reports" as officers' "stock in trade"). To put a finer point on it, the court acknowledged parolees' "incentive to conceal criminality justifies an intensive system of supervision," including the ability to "act on 'reports,' 'tips,' or 'information' that in other contexts might seem too thin." See id. at 654 n.4 (citing Samson v. California, 547 U.S. 843, 855 (2006)). Officers also may factor a suspect's parole status and "criminal history with drugs" into their calculus because such facts "ma[k]e him more likely to commit a drug trafficking crime than the public." See id. at 655.

Perry's arrest began with an anonymous tip of suspected illegal activity on Alricks Street. The complainant did not identify the perpetrator, but they submitted video of "a late-model green sedan," (see 12/13/22 Tr. 6:14-16, 8:1-10, 16:20-17:1), matching the description of Perry's Ford Taurus. Upon encountering Perry, Officer Taylor and APO Kinsinger believed he was ignoring their repeated attempts to get his attention. (See id. at 10:4-11:2, 45:25-46:18, 51:2-53:5). APO Kinsinger knew Perry was on supervision with another parole officer because Perry attended an office appointment with the unit that supervises felony drug offenders. (See id. at 27:23-28:15, 29:20-23, 48:8-20). Perry was very nervous while interacting with the officers.[5] (See id. at 33:12-22). He failed to provide his license and proof of insurance, denied the Taurus was his, and claimed he locked the key inside the vehicle. (See id. at 11:21-12:3, 29:14-19, 31:9-32:17, 55:10-16). Perry's explanation may have satisfied Officer Taylor, but it raised APO Kinsinger's suspicions criminal activity was afoot.

Perry went to great lengths to distance himself from the Taurus and to complicate efforts to access its interior. In addition to (falsely) reiterating he locked the key in the car, Perry said his stepfather—ostensibly the vehicle's owner—had a spare key but would not be home for a few hours. (See id. at 35:1-5). Perry later

---

[5] Perry's anxious demeanor may have been partially attributable to the fact that Officer Taylor and APO Kinsinger immediately handcuffed him. Neither officer provided any testimony sufficient to warrant the belief Perry was armed and dangerous. See United States v. Johnson, 592 F.3d 442, 452-53 (3d Cir. 2010) (citing Baker v. Monroe Township, 50 F.3d 1186, 1193 (3d Cir. 1995)) (requiring justification for handcuffing).

objected when his mother mentioned the Taurus belonged to him rather than her husband.  (See id. at 35:18-21, 39:18-21, 72:7-12).  Under further questioning, Perry indicated he was just coming home from work, even though his shift had ended more than two hours earlier.  (See id. at 35:5-12).  He volunteered to let APO Kinsinger frisk him before spontaneously unzipping his pants and lifting his genitals as if to emphasize he had nothing to hide.  (See id. at 36:2-15).  He also offered up his bedroom for inspection.  (See id. at 36:17).  In hindsight, Perry's compliance was a façade.  Perry successfully had hidden the vehicle key somewhere on his person beyond APO Kinsinger's grasp, and then attempted to pass it off to his mother when several probation officers left to search her home.  (See id. at 38:22-39:6, 61:1-3, 66:10-23, 72:20-73:1).  Alas, Perry's subterfuge was for naught; the remaining officers sussed out his sleight of hand and secured the key.  (See id. at 73:5-24, 74:14-25).

APO Kinsinger was justified in thinking Perry was hiding something of a criminal nature in the Taurus.  He knew the Taurus was the subject of a recent, albeit generalized, complaint of criminal activity, complete with amateur video surveillance.  See Henley, 941 F.3d at 654 ("Griffin endorses the adequacy of generalized information from an unknown source of evidence of a crime in a parole/probation context.").  He also knew Perry was on supervision for a serious drug crime, increasing the likelihood Perry might commit another drug-trafficking offense.  See id. at 655.  Perry responded to the officers' questions with at times dubious, inconsistent, or downright false answers.  See Green, 897 F.3d at 186; Benoit, 730 F.3d at 285-86.  He also was unusually forthcoming in consenting to

14

searches of his person and his bedroom—but not the vehicle. Taken together, all signs pointed to the Taurus as the likely source of contraband, and the officers thus predicated their search upon reasonable suspicion. The Constitution requires nothing more.

### IV. Conclusion

For the foregoing reasons, we will deny Perry's motion to suppress. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:   April 28, 2023